**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

**MARGARET SAMUEL-SIEGEL,** *et al.*,

          *Plaintiffs*,

    v.

**UNITED STATES**,

          *Defendant*.

No. 25-cv-02751

**OPINION**

---

<u>**APPEARANCES**</u>:

**Joseph Peter Veloski**
REILLY, JANICZEK, MCDEVITT, HENRICH & CHOLDEN, PC
Widener Building
One South Penn Square
Philadelphia, PA 19103

    *On behalf of Plaintiffs.*

**Kevin James Maggio**
DOJ, USAO, CIVIL
401 Market Street
P.O. Box 2098
Camden, NJ 08101

    *On behalf of Defendant.*

**O'HEARN, District Judge.**

### INTRODUCTION

This matter comes before the Court on Defendant United States' ("Defendant") Motion to Dismiss Plaintiffs Margaret and Yehonatan Samuel-Siegel's ("Plaintiffs") First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1] (ECF No. 32). The Court heard oral argument pursuant to Local Rule 78.1 on May 28, 2026. For the reasons stated herein, Defendant's Motion is **GRANTED**.

### I.   FACTUAL BACKGROUND

Plaintiffs are the parents of Private First Class Noah Samuel-Siegel ("PFC Samuel-Siegel" or "Decedent"), a deceased Army soldier who died by suicide while stationed in the Republic of Korea. (Compl., ECF No. 23 at ¶¶ 1, 11). Plaintiffs allege that the Department of the Army ("Army") committed negligent and wrongful acts and omissions in its post-death dealings with them, including throughout the Army Regulation 15-6 investigation into Decedent's death (the "15-6 Investigation") and the Army Regulation 638-34 family briefing regarding that investigation. (*Id.* at ¶¶ 2, 7–10).

Specifically, Army Directive 2010-01 requires AR 15-6 Investigations into deaths suspected to have occurred by suicide and requires the deceased soldier's family to be formally briefed on the investigative findings so that the family receives "as full an accounting as possible of the circumstances surrounding the loss of their loved one." (*Id.* at ¶ 8). Army Regulation 638-34 implemented that directive through the Army Fatal Incident Family Brief Program and states that the purpose of the Program is to provide grieving families with a "thorough explanation of

---

[1]  Because the Court concludes that it lacks subject matter jurisdiction over Plaintiffs' claims under Rule 12(b)(1), it does not reach Defendant's alternative arguments for dismissal under Rule 12(b)(6).

releasable investigative results." (Compl., ECF No. 23 at ¶ 9; AR 638-34, ECF No. 32-5 at 8). Army Regulation 638-34 further cautions briefers not to provide "false, inaccurate, or misleading information" in response to the family's questions and directs them to be prepared to address and explain discrepancies among death investigations where feasible. (Compl., ECF No. 23 at ¶ 9; AR 638-34, ECF No. 32-5 at 22, 24).

Following PFC Samuel-Siegel's death on November 6, 2021, Plaintiffs received an in-person briefing on September 15, 2022[2] from Colonel Carl Hennemann, the 8th Army Chief of Staff. (Compl., ECF No. 23 at ¶¶ 28, 35). Plaintiffs allege that the briefing purposefully omitted or presented altered information. (*Id.* at ¶ 35). According to Plaintiffs, the medical-evaluation section of the briefing stated that there was no concern about alcohol use even though Decedent had recently scored high on the AUDIT-C,[3] his command allegedly knew of his alcohol consumption, and partially consumed alcohol bottles were found in his room after his death. (*Id.*). Plaintiffs further allege that the briefing failed to acknowledge the symptoms Decedent reported during a medical evaluation—namely, insomnia, loss of interest in activities he used to enjoy, feeling distant or cut off from other people, and difficulty experiencing positive feelings—and

---

[2] Plaintiffs also allege that the 15-6 Investigation and related family briefing were delayed. Specifically, they allege that the Army delayed the 15-6 Investigation because the autopsy and toxicology report supposedly were unavailable; that Decedent's personal effects were not delivered to their New Jersey home until May 2, 2022; and that, although the 15-6 Investigation concluded on April 18, 2022, Plaintiffs were unable to formally request a briefing until July 18, 2022 and did not receive the in-person briefing until September 15, 2022. (Compl., ECF No. 23 at ¶¶ 32–34). However, Plaintiffs' opposition does not appear to rely on the timing of the 15-6 Investigation, the return of Decedent's personal effects, or the timing of the family briefing as an independent basis for their claims. Rather, Plaintiffs' opposition focuses on the content of the September 15, 2022 briefing and the alleged omissions, misstatements, and inconsistencies between the 15-6 Investigation and the Criminal Investigative Division ("CID") Investigation.

[3] AUDIT-C is an alcohol screening tool that stands for Alcohol Use Disorders Identification Test, Alcohol Consumption Questions. (Compl., ECF No. 23 at ¶ 25).

instead stated that "PFC Samuel-Siegel did not report any concerns with emotional or behavioral health during this assessment, and he was assessed to be in good health." (*Id.* at ¶¶ 25, 36). Plaintiffs also allege that the briefing failed to acknowledge that Decedent's leadership had exceeded the then-current COVID-19 vaccine policy by initiating pre-separation actions for his vaccine refusal, and that Colonel Hennemann conceded during the briefing that the 15-6 report omitted any reference to the command having initiated involuntary separation processing.[4] (*Id.* at ¶ 37).

Plaintiffs allege that the 15-6 Investigation also differed from and conflicted with the Army CID Investigation in material respects. (*Id.* at ¶ 38). First, according to Plaintiffs, the CID Investigation noted that Decedent requested a behavioral-health evaluation on October 18, 2021, but the 15-6 Investigation did not mention that request. (*Id.* at ¶ 38(a)). Second, Plaintiffs allege that witness statements in the CID Investigation described changes in Decedent's behavior, including that he had become quiet and off-put, while the 15-6 Investigation's post-mortem mental-health assessment stated that Decedent's friends did not observe any noticeable behavioral changes. (*Id.* at ¶ 38(b)). Third, Plaintiffs allege that the CID Investigation noted that Decedent received a message from his Team Leader the night before his death directing him to go and possibly sign unidentified paperwork, but that the 15-6 Investigation did not mention that fact. (*Id.* at ¶ 38(c)). Fourth, Plaintiffs allege that notes from a CID Agent's review of Captain Garay-

---

[4] By way of context, Plaintiffs allege that Decedent expressed moral and practical reservations about the COVID-19 vaccine, which was made mandatory across the Department of Defense and its component services in August 2021. (Compl., ECF No. 23 at ¶¶ 12–13). Plaintiffs further allege that Decedent's Company Commander, Captain Abdon Garay-Briones, responded to Decedent's vaccine refusal with abusive threats and coercive disciplinary action. (*Id.* at ¶ 14). Although commanders were expected to ensure that soldiers were fully vaccinated or had documented exemptions by December 15, 2021, Plaintiffs allege that Captain Garay-Briones began involuntary separation processing for Decedent's vaccine refusal on October 14, 2021, before involuntary separation had been authorized by the Department of Defense. (*Id.* at ¶¶ 12, 20).

4

Briones's witness statement indicated that Decedent had been rated as a "moderate" risk, while the 15-6 Investigation stated that Decedent had been reduced to "low" risk. (*Id.* at ¶ 38(d)). Fifth, Plaintiffs allege that the CID Investigation reflected concern from someone in Decedent's chain of command about there being alcohol in Decedent's room, while the 15-6 report indicated no concern related to alcohol use. (*Id.* at ¶ 38(e)). Finally, Plaintiffs allege that the CID Investigation noted Decedent had been assigned to four 24-hour charge-of-quarters shifts during the first thirteen days of October 2021, but that the 15-6 briefing did not acknowledge those repeated 24-hour duties or the resulting change to Decedent's sleep schedule. (*Id.* at ¶ 38(f)).

Plaintiffs allege that, based on these omissions and inconsistencies, it became clear to them that the Army was attempting to cover up the command's knowledge of Decedent's suicide risk and contributing factors, contrary to Army Regulation 638-34's requirement that the Army provide a "thorough explanation" of the events surrounding Decedent's death. (*Id.* at ¶ 39). Plaintiffs further allege that the Army's conduct following Decedent's death exacerbated their emotional distress. (*Id.* at ¶ 29).

## II.     PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint on April 16, 2025 asserting Federal Tort Claims Act ("FTCA") claims for Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress. (ECF No. 1). Following a motion to dismiss by Defendant on September 2, 2025, (ECF No. 22), Plaintiffs filed a First Amended Complaint on September 22, 2025 which added further factual allegations, (ECF No. 23). Defendant filed a Motion to Dismiss the First Amended Complaint under 12(b)(1) and 12(b)(6) on December 2, 2025. (ECF No. 32). Plaintiffs filed their Opposition on December 22, 2025. (ECF No. 33). Defendant then filed its Reply on

December 29, 2025, (ECF No. 34), and Plaintiffs filed a Sur-Reply on January 5, 2026, (ECF No. 35).

### III.    JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1), which grants district courts exclusive jurisdiction over civil actions against the United States for money damages arising from the negligent or wrongful acts or omissions of federal employees acting within the scope of their employment, under circumstances where a private person would be liable under the law of the place where the act or omission occurred. *See CNA v. United States*, 535 F.3d 132, 140 (3d Cir. 2008). The FTCA "operates as a limited waiver of the United States's sovereign immunity," *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010) (citation omitted), provided that the claimant first satisfies the Act's administrative-exhaustion requirement, *see* 28 U.S.C. § 2675(a); *Roma v. United States*, 344 F.3d 352, 362–63 (3d Cir. 2003). Here, Plaintiffs allege that they timely presented their administrative claim to the Army and that the Army failed to issue a final disposition within six months, rendering the claim deemed denied under § 2675(a). (Compl., ECF No. 23 at ¶ 5). Accordingly, the Court has jurisdiction to determine whether Plaintiffs' claims fall within the FTCA's waiver of sovereign immunity or are barred by one of the Act's exceptions. *See CNA*, 535 F.3d at 140–41.

### IV.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) must be granted if the Court lacks subject matter jurisdiction. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). A plaintiff bears the burden of proving that the Court has subject matter jurisdiction. *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (citation omitted).

Under Federal Rule of Civil Procedure 12(b)(1), an attack on subject matter jurisdiction may be either a facial or a factual attack. *CNA*, 535 F.3d at 139. A facial attack "concerns an alleged pleading deficiency whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *Id.* (quotation marks, alterations, and citation omitted). In a facial attack, "the court looks only at the allegations in the pleadings and does so in the light most favorable to the plaintiff." *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). In a factual attack, "it is permissible for a court to review evidence outside the pleadings." *Id.* (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)); *see also Colombo v. Bd. of Educ. for Clifton Sch. Dist.*, No. 11-00785, 2017 WL 4882485, at *3 (D.N.J. Oct. 29, 2017) (alterations and citation omitted) ("For factual attacks . . . 'the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations and the plaintiff will have the burden of proof that jurisdiction does in fact exist.'").

Here, Defendant presents a facial challenge to jurisdiction by arguing that Plaintiffs' claims fall outside the FTCA's limited waiver of sovereign immunity under the misrepresentation and discretionary-function exceptions. (Mot., ECF No. 32-1). *See, e.g., Jamal v. Kane*, 96 F. Supp. 3d 447, 452 (M.D. Pa. 2015) (citations omitted) (explaining difference between facial and factual challenges).

## V.    **DISCUSSION**

"[T]he United States is immune from suit unless it consents to be sued." *White-Squire*, 592 F.3d at 456 (citations omitted). "[T]he terms of such consent define the court's subject matter jurisdiction" and must be "unequivocally expressed." *Id.* (citation omitted). "The FTCA is codified

in scattered sections of Title 28 of the United States Code," and authorizes suits against the United States for damages in limited circumstances. *Id.*; *see also* § 1346(b)(1) (authorizing suit against the United States for damages "caused by the negligent or wrongful act or omission" of a government employee "while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant" under the laws of the place where the allegedly negligent act or omission occurred). However, the government's waiver of immunity is not without limits. Two such limits are relevant here: the FTCA's exception for claims arising out of misrepresentation or deceit, 28 U.S.C. § 2680(h), and the discretionary-function exception, 28 U.S.C. § 2680(a).[5] The Court addresses each exception, and its application to Plaintiffs' claims, in turn.

### A.    <u>Misrepresentation Exception</u>

The first relevant limitation is the FTCA's intentional-tort or misrepresentation exception. Under that exception, the United States retains immunity for "[a]ny claim arising out of . . . misrepresentation [or] deceit." § 2680(h). This exception applies to claims arising out of negligent misrepresentations as well as deliberate ones. *United States v. Neustadt*, 366 U.S. 696, 702 (1961). "[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies." *Block v. Neal*, 460 U.S. 289, 296 (1983). Accordingly, where the substance of a claim is that the government failed to use due care in obtaining or communicating information, the claim falls within the misrepresentation exception. *See id.* at 296–97.

---

[5] Defendant also argues that, to the extent Plaintiffs' claims arise from conduct occurring in the Republic of Korea, those claims are barred by the FTCA's foreign-country exception, 28 U.S.C. § 2680(k). (Mot., ECF No. 32-1 at 35–36). Plaintiffs do not dispute that the foreign-country exception bars claims based on the alleged delay in returning PFC Samuel-Siegel's remains. (Opp., ECF No. 33 at 7 n.1). Accordingly, the Court does not separately address that exception.

In determining whether the exception applies, courts look to the substance of the claim rather than the label attached to it. *Mohn v. United States*, No. 23-1023, 2023 WL 4311609, at *2 (3d Cir. July 3, 2023) (citation omitted). A plaintiff therefore cannot avoid the exception by recasting a claim based on misinformation, omissions, or non-communication as another tort. *See id.* If the claim arises out of the government's alleged miscommunication or non-communication of information, the United States retains its immunity and the court lacks subject matter jurisdiction over that claim. *See* § 2680(h); *Block*, 460 U.S. at 296–97.

Here, Defendant argues that Plaintiffs' claims are barred to the extent they arise out of alleged misrepresentations, deceit, or omissions in the Army's communication of information concerning PFC Samuel-Siegel's death. (Mot., ECF No. 32-1 at 17–22). Specifically, Defendant contends that Plaintiffs' allegations that the Army purposefully omitted or presented altered information during the family briefing, and that the Army's 15-6 Investigation differed from the CID's investigation in material respects, place the claims squarely within § 2680(h). (*Id.* at 19). Plaintiffs respond that the misrepresentation exception has traditionally been confined to claims involving financial or commercial interests and pecuniary harm, and therefore does not apply where, as here, Plaintiffs seek damages for emotional distress arising from the Army's alleged failure to provide truthful information about their son's death. (Opp., ECF No. 33 at 8–11). In reply, Defendant maintains that the Third Circuit has not limited the misrepresentation exception to commercial contexts and argues that other district courts in this Circuit have barred misrepresentation-based FTCA claims outside of commercial contexts. (Reply, ECF No. 34 at 6).

As an initial matter, the Court observes that whether the misrepresentation exception is confined to claims involving financial or commercial interests is a genuinely unsettled issue in this Circuit. *LaLoup v. United States*, 92 F. Supp. 3d 340, 353 n.13 (E.D. Pa. 2015) ("Our Court of

Appeals has not held squarely on whether there is a commercial context limitation in the misrepresentation exception to the FTCA."). Accordingly, Defendant's reliance on *Mohn* and *Beneficial Consumer Discount Co. v. Poltonowicz,* (*see* Mot., ECF No. 32-1 at 18–19), is of limited utility. Although both cases applied the misrepresentation exception, both involved economic or financial harm[6] and therefore did not squarely decide whether § 2680(h) is limited to that setting.

Courts outside this Circuit are divided on the issue. Some courts have taken a narrower view, confining the misrepresentation exception to its traditional or core meaning, which generally requires reliance and pecuniary loss in a financial or commercial context. For example, in *Estate of Trentadue ex rel. Aguilar v. United States*, the family of a deceased federal prisoner brought an intentional infliction of emotional distress claim based on the government's post-death treatment of the family. 397 F.3d 840, 854 (10th Cir. 2005). The government argued that the claim fell within § 2680(h) because the family's damages arose from the government's failure to communicate certain facts. *Id*. The Tenth Circuit disagreed. Relying on *Neustadt* and *Block*, the court explained that the misrepresentation exception applies only when the action falls within the commonly understood definition of a misrepresentation claim, which includes claims arising out of negligent as well as willful misrepresentations. *Id.* But it further reasoned that negligent misrepresentation, in its traditional sense, involves a duty to use due care in obtaining and communicating information upon which a party may reasonably rely in conducting economic affairs, and that such claims have

---

[6] In *Mohn*, the plaintiff alleged that the Department of Education failed to disclose information concerning the financial risk of his student loans, and the Third Circuit held that the claim was barred because its basis was that "through some combination of fraud, misrepresentation, or deceit," the plaintiff was not made aware that the loans could become financially burdensome. 2023 WL 4311609, at *2. Likewise, in *Beneficial Consumer Discount Co.*, the Third Circuit applied the exception where a lender alleged that IRS agents misled it into producing customer information, thereby exposing it to liability under a loan agreement. 47 F.3d 91, 92, 96 (3d Cir. 1995).

been confined "very largely" to financial or commercial interests. *Id.* Because the plaintiffs' emotional distress arose from the government's callous treatment of the family, and because the essential components of negligent misrepresentation—reliance and pecuniary loss—were absent, the Tenth Circuit held that the misrepresentation exception did not apply. *Id.* at 854–55.

Other courts adopting the narrower view have reasoned similarly. In *Kohn v. United States*, the Second Circuit held that the exception did not bar the parents' emotional distress claims arising from the Army's post-death treatment of them after their son was killed, explaining that the exception has "generally been applied only to actions for damages due to commercial decisions that were predicated on incorrect or incomplete information." 680 F.2d 922, 926 (2d Cir. 1982) (citations omitted). And in *Keir v. United States*, the Sixth Circuit held that the exception did not bar a medical-malpractice claim where the alleged misrepresentation was collateral to the negligence claim, while noting that misrepresentation claims have generally been confined "very largely" to financial or commercial interests. 853 F.2d 398, 411 (6th Cir. 1988) (citations omitted).

Other courts have taken a broader view. In *Kim v. United States*, the Ninth Circuit acknowledged that some cases construe the misrepresentation exception as primarily involving economic loss in commercial transactions, but held that "[o]ur cases impose no such limitation" and that those decisions "do not hold that the exception cannot apply in other contexts." 940 F.3d 484, 493 (9th Cir. 2019). The court further explained that the critical inquiry is not the type of harm alleged, but whether the claim is "fundamentally grounded on the common law tort of misrepresentation" rather than one in which misrepresentations are merely collateral. *Id.* at 493–94. Likewise, in *Hanna v. United States*, the Fifth Circuit affirmed dismissal under the misrepresentation exception where the plaintiff alleged that a federal docket clerk's misstatement caused him to lose an opportunity to seek default. 2021 WL 5237269, at *1 (5th Cir. Nov. 10,

2021); *see also Vaughn v. United States*, 259 F. Supp. 286, 289 (N.D. Miss. 1966) (rejecting argument that the misrepresentation exception is limited to transactions of a commercial or financial nature, where courts had applied the exception to claims involving misinformation about weather and floods, property damage from flood waters, and wrongful death arising from allegedly inadequate hurricane warnings).

District courts across the country have reached the same conclusion, rejecting the argument that § 2680(h)'s misrepresentation exception is confined to commercial transactions or pecuniary harm. *See, e.g., Diaz Castro v. United States*, 451 F. Supp. 959, 962–63 (D.P.R. 1978) (collecting personal-injury and wrongful-death cases and concluding that "courts have not hesitated" to apply § 2680(h) outside the commercial-loss context); *Wells v. United States*, 655 F. Supp. 715, 723 (D.D.C. 1987) (rejecting commercial-context limitation and noting that courts have applied the exception to personal-injury and property-damage claims), *aff'd*, 851 F.2d 1471 (D.C. Cir. 1988); *Mullens v. United States*, 785 F. Supp. 216, 220 (D. Me. 1992) (holding that the exception barred claims for personal injuries and emotional distress and that misrepresentation "involves the dissemination of information generally and not only in commercial contexts"); *Russ v. United States*, 129 F. Supp. 2d 905, 909–10 (M.D.N.C. 2001) (holding that "the fact that Plaintiffs suffered personal injuries as opposed to financial injuries does not impact the applicability of the misrepresentation exception"), *aff'd*, 33 F. App'x 666 (4th Cir. 2002); *Najbar v. United States*, 723 F. Supp. 2d 1132, 1136–38 (D. Minn. 2010) (rejecting argument that the exception applies only to "commercial damage" and explaining that *Neustadt* and *Block* described the most common misrepresentation claims, not an exclusive category), *aff'd on other grounds*, 649 F.3d 868 (8th Cir. 2011); *Tompkins v. United States*, No. 21-cv-2286, 2022 WL 1155294, at *2–3 (M.D. Fla. Apr. 19, 2022) (holding that personal injury, rather than commercial or financial injury, "does not

12

impact the applicability of the misrepresentation exception”); *Fabozzi v. United States*, No. 23-cv-10474, 2024 WL 4224158, at *8 (N.D. Fla. Sept. 17, 2024) (same).[7]

On balance, the Court concludes that the misrepresentation exception applies here. Plaintiffs have not cited, and the Court has not located, any authority within this Circuit adopting a commercial-interest or pecuniary-harm requirement. To be sure, the Supreme Court has observed that misrepresentation claims have been confined “very largely” to “the invasion of interests of a financial or commercial character, in the course of business dealings.” *Block*, 460 U.S. at 296 n.5 (quoting *Neustadt*, 366 U.S. at 711 n.26). But the phrase “very largely” is not the same as “exclusively.” Courts normally presume that the Supreme Court acts intentionally and purposely when it includes particular language. *See Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 250 (2d Cir. 1999) (“[L]anguage the Supreme Court uses when it explicitly announces its holding must be assumed to have been crafted with care.”); *Miller v. Bonta*, 699 F. Supp. 3d 956, 970 (S.D. Cal. 2023) (“This Court assumes that the Supreme Court does not use language frivolously . . . that it says what it means and it means what it says.”); *Levich v. Liberty C. Sch. Dist.*, 361 F. Supp. 2d 151, 161 (S.D.N.Y. 2004) (“It should not be assumed that the Supreme Court uses words casually.”). Had the Supreme Court intended to limit the misrepresentation exception to commercial or financial claims only, it could have said so. Instead, *Block* described

---

[7] District courts in this Circuit have also applied the exception outside purely commercial contexts; however, Defendant’s reliance thereon, (Reply, ECF No. 34 at 6 n.3), is misplaced because like the Third Circuit decisions, those cases did not squarely address whether the exception is limited to claims involving financial or commercial interests and pecuniary harm. *See, e.g., Peña v. United States*, No. 23-3117, 2024 WL 5170746, at *4–5 (E.D. Pa. Dec. 19, 2024); *Dorsey v. Burns*, No. 22-431, 2024 WL 4751246, at *3 (D.N.J. Nov. 12, 2024); *Bohnenkamp v. Whisterbarth*, No. 19-115, 2021 WL 1600477, at *8 (W.D. Pa. Apr. 23, 2021); *Nicklas v. United States*, No. 13-1122, 2014 WL 309323, at *3 (W.D. Pa. Jan. 27, 2014). As such, they are of limited value to the Court’s analysis here.

the traditional scope of the tort while holding that the exception does not bar claims premised on a breach of a duty distinct from the duty to communicate accurate information. 460 U.S. at 296–98.

At the same time, the exception should not be read to cover every tort in which a false statement, omission, or communication failure appears somewhere in the causal chain. In *Jimenez-Nieves v. United States*, the First Circuit began with *Neustadt*'s instruction that courts should look to the "traditional and commonly understood definition of the tort" in determining the scope of § 2680(h). 682 F.2d 1, 3–4 (1st Cir. 1982). The court then turned to the Restatement, explaining that although misrepresentation can involve the dissemination of information outside the commercial context, the Restatement still treats reliance by the plaintiff as an essential element of the tort. *Id.* at 4. Because the erroneous internal entry in *Jimenez-Nieves* was not made to the plaintiff and the plaintiff did not rely on it, the court held that the claim fell outside the "traditional, or core, meaning" of misrepresentation under § 2680(h). *Id.* at 5. Thus, the reliance inquiry serves as an important limiting principle, separating claims that merely involve false information somewhere in the causal background from claims that arise out of misrepresentation itself.

That reliance-focused approach is consistent with Third Circuit law. In *Beneficial Consumer Discount Co.*, the Third Circuit explained that "[t]he essence of an action for misrepresentation or deceit, for the purposes of § 2680(h), is a communication of misinformation upon which the recipient relies." 47 F.3d 91, 96 (3d Cir. 1995) (citing *Block*, 460 U.S. at 296–97; *Neustadt*, 366 U.S. at 702–11). District courts in this Circuit have applied the same principle in emotional distress cases outside the commercial setting. *See Bohnenkamp*, 2021 WL 1600477, at *8 (holding that, where the plaintiff's reliance on the alleged misrepresentation was essential to

14

the emotional distress claim, the claim was barred by § 2680(h)); *Nicklas*, 2014 WL 309323, at *3 (same).

That conclusion is also consistent with the statutory text. Section 2680(h) preserves immunity for "[a]ny claim arising out of . . . misrepresentation [or] deceit." § 2680(h) (emphasis added). The word "any" is expansive. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning."); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) (same). And § 2680(h) does not, by its terms, limit the exception to business dealings, commercial relationships, or pecuniary losses. *See LaLoup*, 92 F. Supp. 3d at 353 n.13 ("Section 2680(h) is not by its terms limited to commercial transactions."). The Court therefore declines to graft onto § 2680(h) a commercial-interest or pecuniary-loss limitation that does not appear in the statutory text and has not been adopted by the Third Circuit. Rather, the proper inquiry is whether the substance of the claim depends on a communication of misinformation, or a failure to communicate information, upon which the plaintiff relied.[8]

Applying that standard here, Plaintiffs' claims fall squarely within the exception. Plaintiffs allege that the Army "purposefully omitted or presented altered information" during the family briefing, failed to disclose material information concerning PFC Samuel-Siegel's medical evaluation, alcohol use, and separation processing, and provided information that conflicted with

---

[8] The Court also notes that Plaintiffs' proposed reading would create substantial line-drawing problems. If § 2680(h) applied only to statements made in commercial settings or only where the plaintiff alleged pecuniary loss, then many claims arising from allegedly inaccurate government communications would fall outside the exception simply because the asserted injury was emotional rather than economic. A plaintiff could, for example, premise an FTCA claim on reliance upon an allegedly false or incomplete public statement, press briefing, warning, or other official communication, by virtually any government official, so long as the claimed harm was distress rather than financial loss. Nothing in the statutory text suggests Congress intended the exception to turn on that distinction, particularly where § 2680(h) broadly bars "[a]ny claim arising out of . . . misrepresentation [or] deceit." 28 U.S.C. § 2680(h).

15

or omitted facts contained in the CID investigation. (Compl., ECF No. 23 at ¶¶ 35–38). Those allegations necessarily depend on Plaintiffs' reliance on the Army's communications. Plaintiffs' theory is not merely that the Army spoke, but that the Army's statements and omissions caused additional emotional distress because Plaintiffs credited, or at least placed weight in, the information the Army provided and the information it withheld. *See Nicklas*, 2014 WL 309323, at *3 (finding reliance where alleged misstatements "could have caused confusion and uncertainty only if [p]laintiff had placed some stock in them"). Had the Army's alleged omissions and misstatements played no role in Plaintiffs' understanding of the circumstances of their son's death, those communications could not have caused the emotional harm alleged. Thus, the substance of the claim is that Plaintiffs were harmed by misinformation or non-communication upon which they relied. Under § 2680(h), the United States retains immunity for such claims, and the Court lacks subject matter jurisdiction.

## B. Discretionary Function Exception

Given the unsettled state of the law in this Circuit as to the misrepresentation exception, the Court will further consider whether Plaintiffs' claims are independently barred by the FTCA's discretionary-function exception. As explained below, even if the misrepresentation exception does not fully dispose of Plaintiffs' claims, the discretionary-function exception does.

Under what is known as the "discretionary function exception," a "discretionary function or duty . . . cannot form a basis for suit under the [FTCA]." *United States v. Varig Airlines*, 467 U.S. 797, 811 (1984) (quotation marks and citation omitted). The government bears the burden of proving that the exception applies and that the court is therefore divested of jurisdiction. *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 n.2 (3d Cir. 2012).

16

To determine if an act or omission is considered a "discretionary function," a court must engage in a two-step inquiry. "First, a court must consider if a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997) (quotation marks and citation omitted); *see also Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (citation omitted) (explaining that "conduct cannot be discretionary unless it involves an element of judgment or choice" and therefore, "a court must first consider whether the action is a matter of choice for the acting employee."). When a "governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a [g]overnment agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). If the employee followed a prescribed course of action, then there can be no finding of a discretionary act, and liability may attach. *Gotha*, 115 F.3d at 179.

If no course of action was prescribed, the court moves to the second step of the inquiry where it "must then consider whether the challenged action or inaction is of the kind that the discretionary function exception was designed to shield," or, in other words, whether the action or inaction "involve[d] the permissible exercise of policy judgment." *Id.* (citation omitted). "For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324–25. If the challenged conduct is determined to have been a permissible exercise of policy judgment, then the discretionary function exception applies, and the district court is deprived of subject matter jurisdiction over claims arising out of the discretionary action. *See, e.g., Merando v. United States*, 517 F.3d 160, 162 (3d Cir. 2008)

17

(affirming dismissal for lack of subject matter jurisdiction where the discretionary function exception immunized the United States from suit).

As an initial matter, the parties disagree about how the Court should define the conduct at issue for purposes of the discretionary-function analysis. Plaintiffs frame the challenged conduct narrowly. In their view, the relevant conduct is the Army's alleged provision of "inaccurate and misleading information" during the family briefing, including the alleged failure to adequately address Decedent's medical evaluation, his separation processing, and asserted differences between the AR 15-6 investigation and the CID investigation. (Opp., ECF No. 33 at 11–14). Plaintiffs therefore argue that there is "absolutely no policy reason" for the Army to omit or misstate information to Decedent's parents. (*Id.* at 14). In their sur-reply, Plaintiffs similarly contend that Defendant improperly focuses only on whether AR 638-34 mandated the inclusion of particular information and fails to account for the second step of the discretionary-function inquiry—whether the challenged action was grounded in policy. (ECF No. 35 at 1–2).

Defendant, by contrast, argues that Plaintiffs define the relevant conduct too narrowly. According to Defendant, the challenged conduct is not the Army's alleged failure to include particular facts in a particular briefing, but rather the Army's broader investigation into Decedent's death, its implementation of the Army Fatal Incident Family Brief Program, and the manner in which Army personnel briefed Plaintiffs on the results of the AR 15-6 investigation. (Reply, ECF No. 34 at 7–11). Defendant relies principally on *Merando* and *DiBease v. United States* to argue that courts must not isolate discrete operational decisions in hindsight where those decisions are part of a broader governmental program involving discretionary judgments. (*Id.*).

The Court agrees with Defendant's framing. Under *Merando*, the Court must identify the conduct at issue at the appropriate level of generality. In *Merando*, the plaintiff alleged that the

18

Park Service negligently failed to locate and remove the hazardous tree that killed the decedents and focused the inquiry on the particular tree at issue. 517 F.3d at 165. The Third Circuit rejected that formulation as "too narrow," explaining that the plaintiff's claim was, in substance, a challenge to the Park Service's broader plan for identifying and managing hazardous trees and the execution of that plan. *Id*. at 168. Likewise, in *DiBease*, the Third Circuit rejected the plaintiff's attempt to characterize the conduct as ordinary snow-and-ice removal, holding instead that the conduct had to be viewed together with the Postal Service's broader decision to operate a twenty-four-hour lobby and determine how to maintain access after-hours. No. 23-2779, 2024 WL 4234640, at *2 (3d Cir. Sept. 19, 2024). Viewed in that broader context, the challenged conduct was part of a "larger constellation of choices susceptible to policy analysis." *Id.* at *4.

The same principle applies here. Plaintiffs' proposed framing—whether the Army had discretion to provide incomplete, inaccurate, or misleading information—defines the conduct at issue at too granular a level and risks collapsing the discretionary-function inquiry into the merits of Plaintiffs' tort theory. *See Merando*, 517 F.3d at 166–68. The proper inquiry is not whether Army personnel had discretion to mislead Plaintiffs. Rather, the Court must ask whether the governing Army policies prescribed the specific manner in which Army personnel were required to investigate Decedent's death and brief Plaintiffs, including what particular information had to be presented, how discrepancies among investigative materials had to be addressed, and how

unresolved questions had to be handled.[9] If those policies left room for judgment, the Court must then determine whether the nature of those judgments is susceptible to policy analysis.

The Court has little difficulty concluding that the first prong of the discretionary-function inquiry is satisfied. AR 15-6 expressly affords discretion to investigating officers. It provides that investigating officers "may use whatever method they deem most efficient and effective for acquiring information," including formal testimony, personal interviews, correspondence, telephone inquiry, or other informal means. (ECF No. 32-3 at 42). Appendix C, the Investigating Officer's Guide, likewise states that it "is a guide only" and that "its provisions are not mandatory." (*Id.* at 54). It further leaves the investigating officer to determine what evidence is required, how best to obtain it, and whether to incorporate the results of other investigations. (*See id.* at 54–55). AR 638-34 is similar. It describes itself as "guidance . . . for Army personnel," (ECF No. 32-5 at 8), and provides a standard process for presenting investigative results to family members, but does not prescribe a script, require the inclusion of particular facts, or dictate how the briefer must reconcile every asserted tension between the AR 15-6 investigation and other investigative materials.

Plaintiffs point to provisions stating that the investigating officer "will conduct a timely and accurate investigation," and that the briefer "must be careful not to give false, inaccurate, or misleading information" to the family. (Opp., ECF No. 33 at 12 (citing ECF No. 32-5 at 8, 24)).

---

[9] Defendant also argues that, to the extent Plaintiffs' claims are premised on the Army's handling of Decedent's remains or personal effects, those claims are barred by the discretionary-function exception because AR 638-2 affords the Army discretion in facilitating the disposition of deceased soldiers' remains and personal effects. (Mot., ECF No. 32-1 at 33–35). Plaintiffs do not respond to that argument and seem to clarify that the alleged delay in returning Decedent's remains is not a basis for relief and that those facts are included only as background. (Opp., ECF No. 33 at 7 n.1). Accordingly, the Court understands Plaintiffs not to be proceeding on any theory based on the disposition of Decedent's remains or personal effects and does not address that issue further.

But those provisions do not alter the discretionary character of the overall regulatory scheme. As the Ninth Circuit explained in *Sabow v. United States*, "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." 93 F.3d 1445, 1453 (9th Cir. 1996), *as amended* (Sept. 26, 1996). There, although the plaintiffs alleged that military investigators acted "unprofessional[ly], ineffective[ly], and blindly insensitive[ly]," the Ninth Circuit held that the investigators had not violated any mandatory directive and instead had exercised "the considerable discretion afforded to NIS agents assigned to collect evidence and conduct investigations." *Id.* at 1449, 1453.

The same is true here. Plaintiffs do not identify any mandatory provision requiring Army personnel to include the specific information Plaintiffs now contend should have been included in the briefing, to address alleged discrepancies in a particular manner, or to complete the briefing by a date certain. Nor do they allege that Army personnel failed to conduct an AR 15-6 investigation at all. Rather, Plaintiffs challenge the adequacy and accuracy of the Army's investigation and the manner in which its findings were communicated to them. Those allegations may describe what Plaintiffs view as a careless or even callous exercise of judgment, but they do not identify a violation of a specific, mandatory directive. Because the governing regulations left Army personnel with judgment over how to investigate Decedent's death and how to present the results of that investigation to Plaintiffs, the first prong of the discretionary-function exception is met.

The second prong is also satisfied. Plaintiffs argue that Defendant has not met its burden to show a "rational nexus" between the challenged decisions and "social, economic, and political concerns." (Sur-Reply, ECF No. 35 at 1–2 (citing *Abunabba*, 676 F.3d at 336)). But the Court is not persuaded. The relevant conduct is not, as Plaintiffs contend, "the Army's provision of incomplete, false, or misleading information." (*Id.* at 2). Rather, as explained above, the relevant

conduct is the Army's investigation into Decedent's death, its implementation of the fatal-incident family-brief process, and its execution of that process in communicating investigative findings to Plaintiffs. Viewed at that proper level of generality, the conduct is susceptible to policy analysis.

Courts have repeatedly recognized that military investigations, and related decisions about the scope, conduct, and communication of investigative findings, involve precisely the type of judgment the discretionary-function exception is designed to protect.[10] In *Sabow*, the Ninth Circuit held that claims arising from military investigations into a servicemember's death were barred by the discretionary-function exception, explaining that "[i]nvestigations by federal law enforcement officials, particularly those involving the U.S. military, clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation." 93 F.3d at 1453–54 (citing *Flax v. United States*, 847 F. Supp. 1183, 1190–91 (D.N.J. 1994); *Pooler v. United States*, 787 F.2d 868, 871 (3d Cir. 1986)). Similarly, in *Blakey v. U.S.S. Iowa*, the Fourth Circuit held that claims arising from the Navy's investigation into an explosion aboard the U.S.S. Iowa were barred because "[t]he course that a military investigation takes remains a choice of the officials in charge and implicates policy considerations, making it subject to the discretionary function exception." 991 F.2d 148, 153 (4th Cir. 1993). And in *Black Hills Aviation, Inc. v. United States*, the Tenth Circuit held that decisions concerning the scope of an Army investigation, the release of the crash site, and the return of crash debris were protected discretionary judgments. 34 F.3d 968, 976 (10th Cir. 1994).

---

[10] While Plaintiffs rely on *Kohn v. United States* for the proposition that the Army's alleged provision of inaccurate or misleading information to a deceased soldier's family is not discretionary, (Opp., ECF No. 33 at 12), in that case, the government did not invoke the discretionary-function exception. *See Kohn*, 597 F. Supp. 568, 571 (E.D.N.Y. 1984) ("The United States does not argue that liability is precluded here [for the performance of or failure to perform discretionary functions]."), *aff'd*, 760 F.2d 253 (2d Cir. 1985). Accordingly, the Court finds that this case is of limited utility.

That reasoning applies with equal force here. As Defendant argues in its Motion, "in investigating Decedent's passing and deciding how best to convey the results of that investigation to Plaintiffs, Army personnel were faced with 'the types of political and social considerations that would generally affect an investigation into the non-natural death of a' servicemember, as well as the specific tragic circumstances at issue here." (ECF No. 32-1 at 32). Defendant further argued that those circumstances required the Army "to carefully balance its objective of ensuring that Plaintiffs were appropriately informed with its desire to best assist Plaintiffs in coping with their loss and show due respect and appreciation for Decedent's service," and that "[s]triking the correct balance in these circumstances requires careful consideration of what information to convey, how best to convey it, and when to convey it." (*Id.* at 32–33).

The Court finds that this is sufficient to establish the required rational nexus. The fatal-incident family-brief process necessarily requires Army personnel to balance accuracy, completeness, compassion for grieving family members, investigative integrity, privacy and personnel concerns, military command interests, and the Army's institutional obligation to explain a soldier's death in a manner consistent with its broader responsibilities. These are not ministerial judgments. They are sensitive judgments about how to investigate a servicemember's death and how to communicate the results of that investigation to the next of kin. Under *Gaubert*, the question is not whether the Army made the correct judgment, or whether Plaintiffs plausibly allege that Army personnel acted negligently, insensitively, or even wrongfully. The question is whether the nature of the judgment is susceptible to policy analysis. *See* § 2680(a) (exception applies "whether or not the discretion involved be abused"); *Gaubert*, 499 U.S. at 325 ("The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation,

23

but on the nature of the actions taken and on whether they are susceptible to policy analysis."). Here, the Court finds that it is.

Accordingly, even accepting Plaintiffs' allegations that the briefing was incomplete or misleading, the Court may not isolate the specific alleged omissions from the broader discretionary process in which they occurred. Under *Merando* and *DiBease*, the Court must consider the broader governmental program and the execution of that program, not recast the inquiry as whether the Army had discretion to commit the specific tort alleged. Because the governing policies afforded Army personnel discretion in investigating Decedent's death and briefing Plaintiffs, and because the exercise of that discretion is susceptible to policy analysis, Plaintiffs' claims are independently barred by the discretionary-function exception.

Having concluded that Plaintiffs' claims are barred by both the FTCA's misrepresentation exception and the discretionary-function exception, the Court is deprived of subject matter jurisdiction and will grant Defendant's Motion to Dismiss under Rule 12(b)(1). The Court need not reach Defendant's alternative arguments under Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, (ECF No. 32), is **GRANTED**. An appropriate Order accompanies this Opinion.

**CHRISTINE P. O'HEARN**
**United States District Judge**

24